**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| 1. GEORGE ISAM ADAMS, an individual;<br>2. BARBARA J. ADAMS, an individual;<br>3. BEN LEE ADAMS, and individual; and<br>4. LOYD W. ADAMS, an Individual, Plaintiffs,<br><br><br>     Plaintiff,<br><br>v.<br><br>1. GARVIN COUNTY BOARD OF COUNTY COMMISSIONERS;<br>2. GARVIN COUNTY SHERIFF'S OFFICE;<br>3. DEPUTY SHERIFF JEFF PAUL, individually and in his official capacity as Garvin County Sheriff;<br>4. MCLAIN COUNTY BOARD OF COUNTY COMMISSIONERS;<br>5. MCCLAIN COUNTY SHERIFF'S OFFICE;<br>6. DEPUTY MALCOM BRUMMETT, individually and in his official capacity as McClain County Deputy;<br>7. LT. JAMES HARRYMAN, individually and in his official capacity as McClain County Lieutenant;<br>Defendants.<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No. CIV-14-1337 |

<u>**ORDER**</u>

Plaintiffs George, Barbara June, Ben, and Loyd Adams[1] bring this action against Defendants Deputy Jeff Paul, Deputy Malcom Brummett, and Deputy James Harryman (collectively, the "Individual Defendants"). They have also sued, under theories of municipal liability, the Garvin County Board of County Commissioners ("GCBCC"), the Garvin County Sheriff's Office ("GCSO") (collectively, the "Garvin County Entities") and McClain County Board of County Commissioners ("MCBCC"), the McClain County Sheriff's Office ("MCSO") (collectively, the "McClain County Entities"). All Defendants move for summary judgment. Doc. Nos. 93-96. Plaintiffs oppose. Doc. Nos. 115-18. The Court held a hearing on this matter on September 7, 2016. Having considered the parties' arguments in the briefing and at the hearing, the Court GRANTS the McClain County Entities' Motion for Summary Judgment (Doc. No. 95) in its entirety. The Court GRANTS IN PART AND DENIES IN PART the remaining Defendants' Motions for Summary Judgment.[2]

---

[1] For ease of reference, the Court will at times refer to each Plaintiff by their first name.

[2] At the outset the Court notes that the parties repeatedly utilized briefing by incorporation, some allegedly premising the incorporation on Federal Rule of Civil Procedure 10(c). As the undersigned has recently explained, this reliance was inappropriate. *See Blueberry v. Comanche Cty. Facilities Auth.*, 2016 WL 1717229, at *1 (W.D. Okla. Apr. 28, 2016). Rule 10(c) provides that "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion." Motions, however, are not pleadings. Rule 10 does not contemplate briefing by incorporation and the parties' method increased the Court's workload by making it difficult to fully consider a single set of briefs by referencing other briefs.

With regard to Plaintiffs' response briefs, to the extent Plaintiffs have failed to comply with Local Civil Rule 56.1(d) by failing to cite to evidence to contradict the Defendants' numbered uncontested fact, the fact is deemed admitted pursuant to Rule 56.1(e).

## I.    Relevant Factual Background

Unless otherwise specified, the following facts are not disputed.

The Plaintiffs in this case are family members. Plaintiffs Barbara June and George Adams are the parents of Plaintiffs Ben and Loyd Adams. Barbara June Adams was the owner of Adams Wrecker Service ("AWS"), a wrecker licensed by Oklahoma's Department of Public Safety. George Adams had power of attorney over the business. AWS was located on land owned by Loyd Adams. Ben Adams was an employee of AWS. Plaintiffs assert that the Adams ran AWS as a family business. On December 31, 2012, AWS's license expired. Some time thereafter, a portion of the land was leased to Isidro Teran, the owner of I&A Wrecker Services. Teran also purchased an office building on the premises. There is some dispute, not material here, as to the terms of the leased premises, and the Adams's family and AWS's rights following the transaction with Teran. AWS, Teran, and I&A are not parties to this litigation.

On or around December 27, 2012, GCSO engaged AWS to tow and impound a John Deere Tractor located in Maysville, Oklahoma. AWS employees Ben Adams and Leroy Evans towed and impounded the tractor. The parties agree that at this point, there was a law enforcement hold on the tractor, and Ben Adams was aware that the tractor was stolen property. It later turned out that the tractor had been reported stolen in 2003 by CP Integrated Services ("CP"). Insurer AIG paid CP for its claim on the tractor. CP and AIG are not parties to this litigation.

Subsequently, Ben Adams painted and made repairs to the tractor. It is undisputed that Ben Adams took out a $4500 loan to fix a John Deere tractor. Defendants contend

3

Ben listed the tractor as collateral for the loan, which Plaintiffs appear to dispute. Ben contends he told the bank to put his pick-up truck as collateral for the loan. The record shows that the bank did list the John Deere tractor as collateral for the $4500 loan. *See* Doc. No. 94-11, at 2 ¶ 12(C). While the Court considers this fact disputed, it is not material.

On or about February 21, 2013, Ben Adams and non-party Chris Rushing entered into a sale or conditional sale[3] of the John Deere tractor. As part of the transaction, Rushing gave Ben Adams $1,000 as a down payment and, in exchange, received possession of the tractor. However, Rushing appeared to have some concern about Ben's ownership of the tractor and called GCSO to inquire into the legality of the sale. GCSO told Rushing that Ben could not legally sell him the tractor. Following this call, Rushing requested his down payment back, returned the tractor to Ben, and the sale was either incomplete or cancelled. Ben then told Rushing he had another purchaser. Rushing told GCSO that Ben planned to re-sell the tractor to an individual in another city. During Rushing's conversations with GCSO, it appears he was put in touch with AIG and made arrangements to purchase the tractor from AIG once AIG was in possession of the tractor.

Once Captain Crawford of Garvin County learned of Adams's plan to sell the tractor, he dispatched Deputy Paul and his police dog to request return of the stolen property.[4] According to Defendants, Crawford was concerned that Ben intended to sell a

---

[3] According to Plaintiffs, the sale was conditioned on Rushing paying a $1,000 down payment and paying the outstanding balance of $8,500 by February 22, 2013, after securing a loan.

[4] Plaintiffs disputed that the tractor was still stolen, without citation to any authority or support.

tractor that GSCO had entrusted AWS to keep safe, and his motivation in dispatching Paul was to make that property more secure. In contrast, Plaintiffs assert that Crawford's motivation was to help the insurance company resolve a bill dispute with Plaintiffs over an invoice.

When Paul arrived, he met with Plaintiffs to discuss the purpose of his visit. This initial conversation was, by all accounts, calm and brief. Paul informed Ben and Loyd he was there to take the tractor. Ben and Loyd refused to release the tractor without payment of their invoice or a warrant for its return. The invoice sought $7,500 for hook up, mileage, truck time, extra labor, after hour release, rollback, fuel surcharge, paint and mechanic work and $4,500 for the loan amount, totaling over $12,000. There is no dispute that the insurance company had not authorized Plaintiffs or AWS to perform any work on the tractor. Plaintiffs also informed Paul that he was in McClain County and therefore without jurisdiction. Paul then returned to his vehicle and called Crawford to report Plaintiffs' refusal.

Upon being informed that he was in McClain County and therefore without jurisdiction, Defendant Paul called McClain County for assistance, and Deputy Malcolm Brummett (of McClain County) was dispatched. Paul stayed in his car until McClain County deputy arrived.

When Brummett arrived, Plaintiffs again told him they would not return the property without payment or a warrant, and again sought payment of $12,000. Brummett called Defendant Harryman for assistance.

The parties' accounts vary significantly as to what happened after Defendant Harryman arrived.

<blockquote>1.   *Defendants' account*[5]</blockquote>

According to the Defendants, before arriving at the premises, Harryman called ADA Jeff Virgin, who advised him that he had a basis to arrest Ben for obstruction. Plaintiffs argue that ADA Virgin later became a McClain County District Court Judge and as such found that the officers unlawfully arrested Plaintiffs. This does not, however, dispute McClain County's statement that at the time, ADA Virgin told Harryman he had probable cause to arrest Ben for obstruction. After speaking to ADA Virgin, Harryman spoke to Ben and Loyd in the I&A offices.[6] Ben and Loyd also told him they would not give Paul the tractor without a release and without paying the invoice amount. Harryman asked Teran to stay in the office while he and Plaintiffs exit.

After they exit the building, Harryman attempted to arrest Ben Adams. As Harryman was attempting to arrest Ben for obstruction, George pulled a pistol out of his pocket. Brummett then yelled "he's got a gun," alerting the other officers of the presence of the gun. In response, Harryman and Brummett drew their guns and George dropped his pistol. Harryman then told Ben, Loyd, and Barbara June to get on the ground. Brummett handcuffed and arrested George for feloniously pointing a firearm and carrying a concealed weapon. Paul then picked up George Adams's gun and placed it in his patrol

---

[5] For efficiency, and because there are not material differences, the Court will address the Defendants' statement of facts collectively.

[6] The Garvin County defendants state this conversation took place in the I&A office.

vehicle (undisputed). Brummett then completed the probable cause affidavit for George's arrest.

Sometime thereafter, Paul retrieved his police dog from his vehicle. Harryman then again attempted to arrest Ben, but Ben protested and would not comply. To obtain compliance, Harryman directed Paul to release his dog on Ben, which Paul did. After the dog was deployed, Barbara June grabbed or hit the dog, and Paul pushed her out of the way. Ben was then arrested for interfering with an officer and resisting an officer. Harryman completed the probable cause affidavit for this arrest. Barbara June and Loyd were searched but not arrested. McClain County says no force was ever used against Barbara June and Loyd. Barbara June and Loyd gave statements following the incident that did not mention any details regarding what happened, did not allege any wrongdoing of any officers involved, and did not state injuries sustained by anyone else. Barbara June was later charged with mistreating a police dog and assisting escape from an officer. Tompkins from MCSO completed the probable cause affidavit for her arrest. No charges were ever filed against Loyd.

2.    *Plaintiffs' account*

Plaintiffs' version, however, has some key differences. According to Plaintiffs, things took a turn once Defendant Harryman arrived. After talking to Plaintiffs about the tractor, Harryman aimed his gun at the family. He then told the Adams Family to line up against the building. As they were doing so, Loyd Adams told Harryman to "Go get your paperwork and make this thing easy." In response, Harryman said "I don't have to," and proceeded to stick his gun in Loyd Adam's face, and said "This is my warrant. I can kill

7

you." Witnessing Harryman stick a gun in his son's face, George Adams pulled out his own gun and told Harryman that, "I wouldn't do that, that I got a gun too." George Adams testified he was scared that Harryman was going to shoot his son Loyd. Brummett then yelled "he's got a gun," alerting the officers to the presence of the gun. However, Plaintiffs say that George dropped his gun, not in response to deputies drawing their guns, but because he noticed Harryman's gun was away from his son's face. After he had dropped his gun, the deputies continued to point their guns at him. Paul then seized George's gun. Paul also went to retrieve his own shotgun and his dog. At some point, Ben and his family were ordered to the ground at gun point and they immediately complied. Ben was then handcuffed. After Ben was handcuffed, he yelled to the officers to "[g]et your guns down." Paul then said to Ben, that if he "did not shut up, I'll release this dog on you." Ben then responded (in fear for his family), "I don't care what you do to me, but leave my family alone." Paul, at the direction of Harryman, then released the dog on Ben. Plaintiffs state that the dog must have bitten Ben fifty times, for a number of minutes, and broke the skin. Harryman, during this time, also hit Ben Adams in the back with his knee. In an attempt to protect her son from the attacking dog, Barbara Adams put her hand out to confront the dog. As a result, Barbara June was bitten by the dog, and Paul pushed her out of the way. Plaintiffs do not dispute that Loyd was not arrested or charged.

All parties agree that the charges against Ben and Barbara June, and one charge against George, were subsequently dismissed by a McClain County Judge on November 7, 2013. George's second charge was dismissed on February 4, 2014 by prosecutors.

Plaintiffs filed this lawsuit against Defendants Paul, Harryman, and Brummett in their individual and official capacities, and the Garvin County Entities and McClain County Entities. Plaintiffs assert the following causes of action:

(1)          Unconstitutional Deprivation of Liberty and Seizure of Person under 42 U.S.C. § 1983 against Defendants Brummett, Harryman, and the McClain County Entities;[7]

(2)          Unconstitutional Deprivation of Liberty and Seizure of Property under 42 U.S.C. § 1983 and the Oklahoma Constitution, Article 2 § 30 against Defendant Paul and the Garvin County Entities;

(3)          Excessive Force against all Defendants, both in violation of 42 U.S.C. § 1983 and the Oklahoma Constitution, Article 2 § 30;

(4)          False Arrest and Imprisonment against all Defendants;

(5)          Assault and Battery against all Defendants;

(6)          Conversion against Defendant Paul and the Garvin County Entities;

(7)          Malicious Prosecution against All Defendants.

Plaintiffs also seek punitive and exemplary damages.

---

[7] Plaintiffs initially asserted violation of their Fourteenth Amendment rights in connection with their claims for unlawful seizure of property and person. Doc. No. 29, at ¶¶ 62, 70, 71. In opposing summary judgment, Plaintiffs only argue that the seizures violated their Fourth Amendment rights. Doc. Nos. 115, 116, 117, 118. Accordingly, the Court understands Plaintiffs to reference the Fourteenth Amendment because it made the Fourth Amendment applicable to the States. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *Mondragon v. Thompson*, 519 F.3d 1078, 1082 n. 3 (10th Cir. 2008) ("In a technical sense, a Fourth Amendment claim against New Mexico officers is also a Fourteenth Amendment claim, because that is the amendment that incorporates the Fourth Amendment's protections against the states . . .[w]e avoid this terminology here to reduce confusion.") (citing *Mapp*); *Wilson v. Vill. of Los Lunas*, 572 F. App' x 635, 640 n. 5 (10th Cir. 2014) ("The Fourth Amendment is applicable to the states through the Fourteenth Amendment.") (citing *Mapp.*)

## II.     Threshold Issues

### A.     Assertion of New Claims

Plaintiffs' theories and arguments in an already complicated case continue to shift, expand, and contract. In the interests of efficiency, clarity, and fairness, the Court only considered those causes of action and arguments that Plaintiffs have clearly enunciated in their Amended Complaint **and** addressed in their responses to summary judgment. In other words, if Plaintiffs asserted a claim or theory in their Amended Complaint that was not argued in their summary judgment response, the Court did not consider it. Likewise, if Plaintiffs attempted to assert a cause of action in response to summary judgment that they did not assert or raise in their Amended Complaint, the Court did not consider it.

For example, although Plaintiffs argue in their briefs that the seizure of the tractor and a four-wheeler were unlawful, they do not assert a claim for the unlawful seizure of either vehicle in their Amended Complaint. *See* Doc. No. 29. At the hearing, Plaintiffs' counsel asserted that their Second Cause of Action encompassed this claim. Hearing Transcript, at 38:14-39:21. However, that claim is limited to the seizure of George Adams's gun. The claim specifically discusses only the seizure of the gun (*see* Doc. No. 29, 11 at ¶¶ 70-72), and is asserted only against Defendants Paul and the Garvin County entities, Doc. No. 29, at 10, despite the fact that Plaintiffs argue, in opposition to summary judgment, that all Defendants were responsible for the unlawful seizure of the four-wheeler and/or tractor. *See, e.g.*, Doc. Nos. 115, at 19-20; 116 at 25-26, 117 at 19-20, 118 at 24-25.

Similarly, when directed by the Court to identify the various causes of actions, and bases thereof, asserted by each Plaintiff, counsel again sought to expand Plaintiffs' claims. For example, Plaintiffs' counsel argued that they were asserting a cause of action for trespass where, admittedly, none appeared in the Amended Complaint. *See* Hearing Transcript, at 38:1-5. The Court will not permit any such expansion of the claims in this matter at this late stage.

The Court recognizes that in this Circuit, raising a new claim in response to summary judgment is construed as a request to amend the complaint. *Martinez v. Potter*, 347 F.3d 1208, 1211-12 (10th Cir. 2003). Rule 15, which governs amendments, provides that leave to amend must be granted freely when justice so requires. Fed. R. Civ. P. 15(a)(2). Nevertheless, it is proper to deny leave for untimeliness. *Smith v. Aztec Well Servicing Co.,* 462 F.3d 1274, 1285 (10th Cir. 2006). In considering the timeliness of a request to amend, the Court considers the reason for the delay. The Tenth Circuit has held that denial of leave to amend is proper "when the party [requesting leave] has no adequate explanation for the delay." *Frank v. U.S. West*, 3 F.3d 1357, 1365-66 (10th Cir. 1993); *see also Smith*, 462 F.3d at 1285 (parenthetically quoting *id.*). Here, even if the Court were to construe these arguments as requests to amend, Plaintiffs offer no explanation for their delay of over three years in raising these claims. Thus, Plaintiffs are limited to those claims raised in their Amended Complaint.

## B.    The Preclusive Effect of State Court Ruling

The State Court dismissed the charges against Ben and Barbara June Adams, and one charge against George Adams because the State Court deemed that the arrests were

unlawful. Plaintiffs argue that this decision has a preclusive effect on the proceedings before the Court, in particular on the probable cause inquiry. The Court disagrees.

For issue preclusion to attach, Defendants "must have been parties to that criminal proceeding or in privity with the parties in that action." *McFarland v. Childers*, 212 F.3d 1178, 1185 (10th Cir. 2000) (quotation marks and citations omitted). Here, as in *McFarland*, the state was a party to the criminal proceedings. And as in *McFarland*, the officers in their individual capacities are not in privity with the state.[8] *Id.* at 1186. Accordingly, because there was no privity, issue preclusion does not apply.

## III.   The Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted). The non-movant may do so by: "(A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Defendants need not negate Plaintiffs' claim or disprove their evidence,

---

[8] Plaintiffs only raised the issue of preclusion with respect to the Individual Defendants. Accordingly the Court limits its analysis of issue preclusion as to those Defendants.

but Defendants do have the burden to show that there is no evidence in the record to support Plaintiffs' claims. *Celotex v. Catrett*, 477 U.S. 317, 325 (10th Cir. 2012).

"An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way . . . An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citations omitted). In short, the Court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986). While all facts and reasonable inferences therefrom are construed in the light most favorable to the non-moving party, *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712-713 (10th Cir. 2014), "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [non-movant]." *Anderson*, 477 U.S. 252. At summary judgment, the Court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## IV.    Plaintiffs' § 1983 Claims Against the Individual Defendants

### A.    The Qualified Immunity Standard

Where, as here, the Defendant officers assert the qualified immunity defense, the burden shifts to the Plaintiffs to show  (1) a constitutional or statutory right has been violated and (2) that this right was "clearly established" at the time of the incident. *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) Plaintiffs may show a right was clearly

established by pointing to Tenth Circuit or United States Supreme Court law, or by showing that "the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id.* at 1005 (quotation marks and citations omitted). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir.), *cert. denied,* 135 S. Ct. 881, 190 L. Ed. 2d 705 (2014) (citations and quotation marks omitted). While considering whether Plaintiffs have met this burden, the Court continues to construe the facts in the light most favorable to Plaintiffs. With this legal framework in mind, the Court turns to Plaintiffs' claims.

**B. First Cause of Action – Unconstitutional Deprivation of Liberty/Seizure of Person**

Plaintiffs argue that that: 1) Ben Adams's arrest; 2) George Adams's arrest; and 3) the family being lined up at gunpoint all constitute unlawful seizure of the person in violation of the Fourth Amendment. Plaintiffs assert these causes of action against the McClain County Defendants and Defendants Harryman and Brummett. Doc. No. 29. [9]

The Fourth Amendment prohibits warrantless seizures without probable cause. There is no question that all of the arrests in question were warrantless. The question is,

---

[9] This first cause of action was only pled against the McClain County Entities and Defendants Harryman and Brummett. *See* Doc. No. 29. The Court does not read Plaintiffs' responses to summary judgment to seek to expand this claim to Defendants Paul or the Garvin County Entities. Doc. Nos. 115, 118. Nor have Plaintiffs moved to amend their complaint or otherwise requested any expansion of this claim to include the other Defendants. Accordingly, the Court will proceed to analyze these claims as against Defendants Harryman, Brummett, and the McClain County Entities.

therefore, whether the officers had probable cause to effectuate these arrests. *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (2008) (warrantless arrest violates Fourth Amendment if unsupported by probable cause). The focus of the probable cause inquiry is on the reasonably trustworthy facts and information that the officers possessed; an officer's subjective belief is irrelevant:

> In evaluating the existence of probable cause, we consider whether the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed . . . Our determination on this score is an independent and objective one. Thus an officer's own subjective reason for the arrest is irrelevant, and it does not matter whether the arrestee was later charged with a crime.

*Id.* (quotation marks and citations omitted); *Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006) ("It is constitutionally irrelevant that [the officer's] reason for arresting [plaintiff] was his incorrect belief that she had violated a restraining order. All that matters is whether he possessed knowledge of evidence that would provide probable cause to arrest her on *some* ground.").[10]

Additionally, because Defendants assert the qualified immunity defense, the proper question is whether *arguable* probable cause existed for these arrests. *Stonecipher*, 759 F.3d at 1141. That is, whether the "officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Id.* (citations omitted). If

---

[10] Accordingly, that Ben was arrested for obstruction and charged with false pretenses is constitutionally irrelevant. *Apodaca*, 443 F.3d at 1289.

so, then even if Defendants were mistaken, they nonetheless are entitled to qualified immunity. *Id.*

### 1. *Ben Adams's Arrest*

The parties' probable cause arguments as to Ben Adams's arrest pivot on different legal interpretations of the following undisputed facts. The officers were aware that Garvin County Sheriff's Office had requested that AWS impound a stolen tractor, that Ben Adams towed the tractor, that Ben Adams had sold (or conditionally sold) it to Christopher Rushing, and let Rushing take possession of the tractor in exchange for a down payment of $1,000. Chris Rushing informed officers of the sale and his subsequent cancellation and that Ben returned the $1,000 down payment to him and took possession of the tractor. Chris Rushing also told officers that Ben had another buyer lined up, potentially in another city. *See* Doc. Nos. 93-2 at 90:2-4; 95-4 at 73:1-74:2. When the officers arrived, at varying times, Ben declined to turn over the tractor without being paid an invoice of over $12,000. *Compare* Doc. No. 95, at ¶ 19; *with* Doc. No. 116, at ¶ 19; *see also* Doc. No. 95-14 (invoice). This invoice went beyond the typical towing and storage fees of the tractor. Doc. No. 95-14. The invoice revealed that Ben demanded reimbursement for thousands of dollars of unauthorized repairs and improvements on the tractor and a $4,500 loan. *Id.*; Doc. No. 93-4, at 168:13-19 (Ben's testimony that he included the loan as a line item to the invoice he handed the officers). [11]

---

[11] There is dispute as to whether Ben put the tractor up as collateral for the loan. This is irrelevant for these purposes since Ben sought repayment for that loan before releasing the tractor.

The parties also agree that, in general, Okla. Stat. Ann. tit. 42 § 91A is the statutory scheme that governs a wrecker services' rights and obligations as to vehicles they tow at the request of law enforcement. Under the statute, AWS was in lawful possession of the tractor and had a possessory lien for the costs for towing and storing the tractor. *See* Okla. Stat. Ann. tit. 42 § 91A(A)(2). After thirty days accrue, the wrecker may initiate foreclosure proceedings on that lien. *See* Okla. Stat. Ann. tit. 42 § 91A(A)(3)-(4). As part of the foreclosure proceedings, the wrecker service must issue notice as proscribed by the statute. *Id.*

Defendants argue that Ben Adams's actions exceeded the rights that AWS had under Section 91A, and therefore constituted embezzlement. Under Oklahoma law, embezzlement is "the fraudulent appropriation of property of any person or legal entity, legally obtained, to any use or purpose not intended or authorized by its owner, or the secretion of the property with the fraudulent intent to appropriate it to such use or purpose, under any of the following circumstances: . . .(1) Where the property was obtained by being entrusted to that person for a specific purpose, use, or disposition . . . Embezzlement does not require a distinct act of taking, but only a fraudulent appropriation, conversion or use of property." Okla. Stat. Ann. Tit. 21 § 1451(A). Ben's actions of taking a loan out on the tractor (as they understood it), selling and then re-selling the tractor rather than foreclosing on it, was embezzlement, and officers therefore had probable cause to arrest Ben.

Plaintiffs disagree. They argue that this was nothing more than a civil dispute over a bill before the officers became involved. Plaintiffs assert that *Williamson v.*

*Winningham*, 199 Okla. 393 (1947) is instructive. The plaintiff in *Williamson* entered into an agreement with the defendant-owner's father to do certain repairs to defendant's car following an auto accident. *Id.* at 395. While the defendant did not initially authorize the work done, he subsequently ratified it. *Id.* Defendant later changed his mind, however, and repossessed his car without paying the plaintiff. Plaintiff then sued. *Id.* The court found that plaintiff had a valid lien for services performed and was entitled to payment of the same, and that defendant wrongfully repossessed himself of the tractor. *Id.*

Accordingly, because this was no more than a bill dispute, Plaintiffs contend, the officers were merely acting as "repo men" on behalf of the insurance company,[12] and were required to initiate a replevin action pursuant to Okla. Stat. Ann. tit. 22 § 1321. This statute governs the procedure that officers must follow *after* the embezzled property comes into their possession:

> A. It is the intent of the Legislature that any stolen or embezzled money or other property ***held in custody of a municipality, county or the state*** in any criminal investigation, action or proceeding be returned to the proper person or its lawful owner without unnecessary delay.
>
> B. If the property ***coming into the custody of a municipal, county or state peace officer*** is not alleged to have been stolen or embezzled, the peace officer may return the property to the owner upon satisfactory proof of ownership. The notice and hearing provisions of this section shall not be required for return of the property specified in this section if there is no dispute concerning the ownership of the property. Within

---

[12] Plaintiffs' assert that the testimony of Garvin County officer Captain Crawford shows that the officers were picking up the tractor for the insurance company is belied by the testimony that Plaintiffs' cite for that assertion. *See* Doc. No. 117, at 12 (citing Deposition of Captain Travis Crawford, Doc. No. 117-3, at 91:9-15, 92:21-25, 93:8-16). Captain Crawford testified that the intent was to move the tractor to a "more secure facility" so that the Adams family can work it out with the insurance company. Doc. No. 117-3, at 91:2-8.

fifteen (15) days of the time the owner of the property is known, the peace officer shall notify the owner of the property that the property is in the custody of the peace officer. The property shall be returned to the owner upon request.

C. Except as otherwise provided for property that is pawned, ***when money or property alleged to have been stolen or embezzled, comes into the custody of a peace officer***, the peace officer shall hold it subject to the order of the magistrate authorized by Section 1322 of this title to direct the disposal thereof.

. . .

Okla. Stat. Ann. tit. 22, § 1321 (emphasis added).

After careful consideration of the parties, arguments, the Court agrees with Defendants that probable cause existed to arrest Ben Adams for embezzlement. Before going to the premises, officers were aware that Ben had already sold the tractor (conditionally or otherwise) to Chris Rushing, and had even turned over possession. Officers were aware that the sale had fallen through, that Ben had retrieved the tractor, and intended to sell it to a second buyer in another city. This gave the officers reason to believe that Ben was attempting to embezzle the tractor. Upon arrival to the premises, Ben's own actions confirmed that belief. Ben refused to release the tractor to law enforcement without a warrant or payment of an invoice for over $10,000 dollars. The invoice revealed that Ben had invested thousands of dollars on the tractor and indicated he may have taken a $4,500 loan using the tractor as collateral. And Ben had no legal basis for any of these actions. Under Section 91A, AWS (not Ben) only had a *possessory* interest in the tractor and was entitled to recoup reasonable costs for towing and storage.

At most, the law permitted AWS to foreclose on this lien by issuing the proper notice.[13] Ben's actions unquestionably exceeded the bounds of Section 91A. Upon this information, the officers reasonably concluded that there was probable cause to arrest Ben for embezzlement.

Moreover, even if Defendants were mistaken, they at the very least had arguable probable cause. Defendants assert that Defendant Harryman had called the Assistant District Attorney at the time, Jeff Virgin, who told him that there was probable cause to arrest Ben for obstruction. Doc. No. 95, at ¶ 23. Plaintiffs offer no evidence to dispute this. This further supports that Defendants' probable cause determination was reasonable. *See Stonecipher*, 759 F.3d at 1145 (effort to secure second opinion of AUSA undercuts notion that officer acted recklessly or that probable cause determination was objectively unreasonable) And while the same ADA, in his capacity as McClain County District Judge, later determined that the arrests were unlawful, this would at most indicate that the conclusion was mistaken, not unreasonable.

The authority that Plaintiffs cite does not compel a different conclusion. Unlike the plaintiff in *Williamson*, Ben had no authority to do repairs and improvements that he demanded payment on. More critically, there was no threat that the plaintiff in *Williamson* was going to sell the vehicle out from under its rightful owner. Likewise, Ben's actions render the scheme in Section 1321 inapposite. This statute serves to guard against due process violations resulting from the deprivation of property. The

---

[13] At the hearing, Plaintiffs' counsel suggested that Ben did not have the opportunity to foreclose on the tractor. However, he could not point to any evidence in the record that Ben had ever intended to foreclose on the tractor. Hearing Transcript at 46:19-47:3. Further, it is not clear how Ben could have foreclosed on a tractor he had already sold.

paradigmatic example involves scenarios in which police retrieve stolen items from a pawnshop owner (who is a bona fide purchaser of the item) and return the ring to the rightful owner without affording the pawnshop owner a hearing. *See, e.g., Winters v. Bd. of Cty. Comm'rs*, 4 F.3d 848 (10th Cir. 1993); *Wolfenbarger v. Williams*, 774 F.2d 358, 364 (10th Cir. 1985). This statute does not govern the procedure law enforcement must follow when suspecting an individual of embezzlement.

Accordingly, because the Court finds there was probable cause for Ben's arrest it likewise concludes that his arrest did not violate his Fourth Amendment rights. Because there was no constitutional violation, the Court need not reach the "clearly established" prong of the qualified immunity inquiry. However, the Court notes that Plaintiffs would not have been able to satisfy this burden. In addition to the distinguishable authority discussed above, Plaintiffs only generally argue that Ben's arrest violated the clearly established right to be free from unlawful seizures. Doc. No. 117, at 31. Courts must refrain from defining "clearly established law" in such general terms. *Quinn*, 780 F.3d at 1005 ("Nevertheless, the Supreme Court has 'repeatedly told courts ... not to define clearly established law at a high level of generality.'") (quotations and citations omitted).

Accordingly, the Court GRANTS summary judgment as to Ben Adams's Unconstitutional Deprivation of Liberty and Seizure of Person under 42 U.S.C. § 1983 for his arrest.

> 2. *George Adams's Arrest*

Turning to George Adams's arrest, the Court determines that factual disputes preclude a finding of probable cause. Defendants argue that there was probable cause to

arrest George Adams for violation of Okla. Stat. Ann. tit. 21 § 1289.16, because he aimed a gun at officers while Defendant Harryman was attempting to arrest Ben Adams. Plaintiffs, however, contend that George pulled out his gun in self-defense of his son, Loyd. Loyd had asked Defendant Harryman for his "paperwork." In response, Defendant Harryman aimed his gun at Loyd and told him: "This is my warrant. I can kill you." Doc. No. 117, at 15; Doc. No. 117-1, at 38:15-18 (Deposition Testimony of George Adams). Accordingly, Plaintiffs argue that George's actions were lawful under Okla. Stat. Ann. tit. 21 § 1289.25, and probable cause was therefore lacking.

These disputed facts bear on whether the officers had probable cause to arrest George Adams.  By Plaintiffs' account, the Defendants would lack probable cause to arrest George, and his seizure would have violated his Fourth Amendment rights. Additionally, it would have been objectively unreasonable for them to believe their actions were lawful under clearly established law. *See* Okla. Stat. Ann. Tit. § 1289.25; *Carter v. State*, 507 P.2d 932, 934 (Okla. Cr. Ct. App. 1973) (family member may come to the aid of a person who is subjected to an officer's use force that exceeds what is reasonably necessary, even if the arrest is lawful) (quotation omitted);[14] *see also Gouskos v. Griffith*, 122 F. App'x 965, 976-77 (10th Cir. 2005) (citing *id.*).

Accordingly, Defendants Harryman and Brummett's motion for summary judgment as to this claim is DENIED.

---

[14] As discussed *infra*, there is a genuine dispute as to whether Harryman used excessive force.

### 3. Family Lined up at Gunpoint

Finally, all Plaintiffs argue that they were all seized when they were lined up or ordered to the ground at gunpoint. This clearly would be a seizure under the Fourth Amendment right. *Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1187–88 (10th Cir. 2001) (plaintiffs had been seized when the police threatened them at gunpoint, even though not all plaintiffs ultimately arrested). Attempting to justify the seizure, Defendants argue they lined the Plaintiffs up at gunpoint because George Adams pulled out his weapon, when the situation was deteriorating rapidly. Plaintiffs dispute these facts, and argue that the officers forced them to line up at gunpoint before George pulled his gun, and at a time when all Plaintiffs were complying with the officers' commands and posed no safety risk. Plaintiffs' facts suggest that this seizure violated Plaintiffs' Fourth Amendment. *Holland*, 268 F.3d at 1193. And it has long been established that when an officer continues to aim a weapon at individuals who do not pose a risk of danger or injury to the officers or others is unreasonable. *Id.*

Accordingly, Defendants Harryman and Brummett's motion for summary judgment as to this claim is DENIED.

### C. Second and Sixth Causes of Action – Unlawful Seizure and Conversion of George Adams's Gun

At the hearing, Plaintiffs' counsel represented to the Court that his clients had confirmed that the gun had been returned to George Adams. Hearing Transcript, at 36:24-37:1. By agreement, these causes of action are dismissed.

## D. Third Cause of Action - Excessive Force in violation of 42 U.S.C. § 1983[15]

The Court next turns to Plaintiffs' excessive force claim. Plaintiffs argue that the following acts were excessive uses of force: the use of a police dog on Ben Adams, which subsequently also bit Barbara June Adams; shoving a gun in Loyd Adams's face after he requested officers' paperwork; pushing Ben Adams to the ground and pushing a knee into his back once he was subdued; pushing Barbara Adams away from the dog; aiming guns at George Adams after he dropped his gun; and aiming guns at the entire Adams family.

An officer "violates an arrestee's clearly established Fourth Amendment right to be free of excessive force during an arrest if the officer's arresting actions were not 'objectively reasonable in light of the facts and circumstances confronting him.'" *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1313-14 (10th Cir. 2002) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)) (citations from *Graham* omitted).[16] To determine whether the force used was objectively reasonable, the Tenth Circuit requires courts to:

> [c]arefully consider the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." [*Graham* U.S. at] 396. .

---

[15] The Plaintiffs initially alleged a claim of excessive force under the Oklahoma Constitution. Plaintiffs later conceded these claims were not viable in light of recent Supreme Court authority. Doc. No. 116, at 29-30. Plaintiffs thus directed the Court to the arguments related to their claims under the OGTCA. *Id.* at 30.

[16] The Court's analysis as to Plaintiffs' Fourth Amendment seizure claims does not impact this analysis, as claims for unlawful arrest and excessive force are treated separately. *Maresca v. Bernallio Cnty.*, 804 F.3d 1301, 1313 (10th Cir. 2015) (plaintiffs' success of unlawful arrest claims did not carry over to their excessive force claims; likewise, assertion of the qualified immunity defense on unlawful arrest did not serve to insulate an officer from excessive force claims)

. An "[a]ssessment of the degree of force actually used is critical to the question of whether the force was excessive." *Grauerholz v. Adcock,* 51 Fed.Appx. 298, 300 (10th Cir.2002) (unpublished) (citing *Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

*Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016)

Even if Defendants assert the qualified immunity defense, summary judgment is not proper in excessive force cases if there are any disputed issues of material fact. *Olsen*, 312 F.3d at 1314 (making clear that "[the Tenth Circuit] will not approve summary judgment in excessive force cases – based on qualified immunity or otherwise – if the moving party has not quieted all disputed issues of material fact.")

1. *Barbara June's Excessive Force Claims*

Barbara June argues Defendants used excessive force when Defendants deployed the police dog on Ben Adams, and Paul subsequently pushed her out of the way of the dog. Defendants argue that these acts were an unintentional result of Barbara June intervening and thus did not constitute a Fourth Amendment violation.

"To state a claim of excessive force under the Fourth Amendment, a plaintiff must show both that a 'seizure' occurred and that the seizure was 'unreasonable.'" *Estate of Bleck ex rel. Churchill v. City of Alamosa, Colo.*, 540 F. App'x 866, 869 (10th Cir. 2013) (quoting *Bella v. Chamberlain,* 24 F.3d 1251, 1255 (10th Cir.1994) (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989))). For a Fourth Amendment seizure to occur, there must be an "intentional acquisition of physical control." *Childress v. City of Arapaho*, 210 F.3d 1154, 1156 (10th Cir. 2000) (quoting *Brower,* 489 U.S. at 596). This

can occur even if "an unintended person is the object of a detention or taking, but *the detention or taking itself must be willful.*" *Childress*, 210 F.3d at 1156 (quoting *Brower,* 489 U.S. at 596) (emphasis added). In other words, only "when there is a governmental termination of freedom of movement *through means intentionally applied*" is the Fourth Amendment implicated. *Brower*, 489 U.S. at 597. The Tenth Circuit has advised that the requirement that the detention or taking must be willful is not "met by the deliberateness with which a given action is taken." *Childress*, 210 F.3d at 1157 (citations and quotation marks omitted).

The Tenth Circuit explored the contours of this requirement in *Childress*. 210 F.3d 1154. There, hostages sustained injuries from gunshots intended for their captor. *Id.* The hostages sued, claiming excessive force under § 1983. Finding there was no evidence that the hostages were "seized" as required for a constitutional violation, the Tenth Circuit affirmed dismissal of their claims. *Id.* at 1157. The Court so found because the officer's intended to use the force to restrain the captors, not the hostages. Other Circuits considering whether attacks by a police dog constituted excessive force have reached similar conclusions. For example, in *Dunigan v. Noble*, a case cited by the Defendants, the Sixth Circuit found no constitutional violation when a canine officer bit a suspect's mother during a search of her home. 390 F.3d 486 (6th Cir. 2004). As the canine was searching for the suspect, the mother stumbled towards the dog, and broached its "defensive perimeter." *Id.* at 492. Based on those circumstances, similar to those here, the Court of Appeals determined that the officer did not "seize" the plaintiff "through means intentionally applied." *Id.* at 493 (quoting *Brower*, 489 U.S. at 596). Recently, the Ninth

Circuit similarly affirmed a grant of summary judgment on excessive force claims because there was no evidence that the officer intentionally deployed the police dog in an effort to seize the plaintiff. *See Gangstee v. Cty. of Sacramento*, 567 F. App'x 500 (9th Cir. 2014).

Under the guidance of the above-cited authority, the Court finds that Barbara June's excessive force claims cannot survive. It is undisputed that Barbara June sustained both the dog bite and the push when she intervened in the officers' efforts to seize Ben Adams. Def. Paul's Motion for Summary Judgment, Doc. No. 94, at 17 ¶ 42 ("Barbara Adams interfered by placing her hand in-between Paul's dog and Ben Adams and in response Paul pushed Barbara Adams out of the way"); Plaintiffs' Response, Doc. No. 115 at 11 ¶ 42 ("*Disputed.* Barbara Adams put her hand out there to confront the dog because it was attacking her son, Ben Adams, and she wanted to prevent it from 'getting to Ben's face.'").[17] Accordingly, the complained of acts were not the result of intentional force, in the context of the Fourth Amendment.[18]

Moreover, even if the push had constituted a seizure, Plaintiffs have not carried their burden under the qualified-immunity analysis. Even by Plaintiffs' accounts, the situation was rapidly deteriorating at this point and Barbara June's spontaneous act forced Paul to make a split-second decision on how to respond to a bystander interfering with a

---

[17] While Plaintiffs purportedly dispute Defendants' statements, Plaintiffs' own statement of fact leads the Court to the conclusion that Barbara June intervened with the dog's deployment of its command.

[18] Although the Court finds that Barbara June may have been seized by officers aiming a gun at her, this is separate from the present inquiry. *See Bella*, 24 F.3d at 1256 ("A seizure is a single act, and not a continuous fact.")

police dog in the course of its duties.[19] Plaintiffs have not cited any authority that persuades the Court that Paul's act of pushing Barbara June was unreasonable, let alone objectively unreasonable in light of clearly established law.

Accordingly, summary judgment is GRANTED as to Barbara June's excessive force claim regarding the use of the dog and the push by Defendant Paul.

### 2. *Plaintiffs' Remaining Excessive Force Claims*

Plaintiffs have made the requisite showing regarding the remaining alleged incidents.

### a. *Ben Adams's Excessive Force*

Plaintiffs assert that while Ben Adams was already on the ground and handcuffed, police deployed a police dog to attack him, and Defendant Harryman pressed his knee into Ben's back, injuring him. The officers counter that at the time of these incidents, Ben was actively resisting arrest.

The Court considers whether the force used, assuming the facts in the light most favorable to Plaintiffs, was unreasonable in the context of the *Graham* factors. The Court determines that it was. Even assuming that the crime – felonious embezzlement – would be considered a serious crime, the remaining *Graham* factors indicate the force was unreasonable. Ben, handcuffed and on the ground, did not pose any threat to the safety of officers or others. Nor was Ben resisting or evading arrest – he was already in handcuffs. And the amount of force used – deploying a police dog to attack Ben – was substantial.

---

[19] For the purposes of this excessive force inquiry, the Court must presume that the push, if a seizure, was lawful. *Maresca*, 804 F.3d at 1313.

The use of such force on a suspect who posed no threat to officer safety and was handcuffed and on the ground was unreasonable, and violated Ben Adams's Fourth Amendment right to be free from excessive force.

And, if a jury agrees with Plaintiffs' version of events, such a use of force would be excessive and objectively unreasonable in light of a clearly established law. While the Court has not found a case directly on point the Tenth Circuit has long held that the use of force on a suspect who is restrained and poses no threat is excessive.[20] *See Olsen,* 312 F.3d at 1314–15 (allegations showed excessive force on arrestee, suspected of credit card fraud, where officer allegedly pushed him into a store window, pushed his arm up into the middle of his back while handcuffing him, despite the fact that he was passively cooperating); *see also Perea*, 817 F.3d at 1204 (10th Cir. 2016) (in 2011, it was "clearly established law in the Tenth Circuit that the use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force") (collecting cases); *Chidester v. Utah Cty.*, 268 F. App'x 718, 729 (10th Cir. 2008) ("It is . . . clearly established that a law enforcement officer may not use force on a compliant suspect already under the officer's control and not resisting detention or trying to flee."). The Court also finds persuasive a case from the Eleventh Circuit Court of Appeals, which found that deploying a canine on a compliant arrestee was excessive. *See Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919 (11th Cir. 2000); *see also Savannah v. Collins*, 2015 WL 4237592, at *3-4 (D. Colo. July 14,

_____

[20] The Tenth Circuit uses a "sliding scale" approach to determine if a law is clearly established. *Fogarty*, 523 F.3d at 1161. "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* (citations and quotations omitted).

2015) (citing *id.*, while no Tenth Circuit precedent on point, "Tenth Circuit precedent and common sense establish that giving an attack command to an unrestrained police dog after a suspect has been subdued would be excessive and unreasonable. The Eleventh Circuit said this clearly in the *Priester* case, and I conclude that the Tenth Circuit would probably come out similarly.")

Accordingly, summary judgment is DENIED with respect to this claim.

### b.     *Plaintiffs' Excessive Force Claims for Use of Guns*

The next issue involves the officers aiming their guns at the entire Adams family, including the specific uses of guns towards Loyd and George Adams. The officers argue that they only pointed their guns at the Adams family in response to George Adams pulling a gun on them. At that point, the officers argue, they did not know whether the rest of the family members were armed, and needed to restrain them immediately by aiming their own weapons at the whole family. Plaintiffs, however, argue that officers aimed their weapons at Plaintiffs before George pulled out his weapon and continued to aim guns at them after George put his gun away.  Accordingly, when and under what circumstances the officers aimed their weapons at the various Plaintiffs is hotly disputed.

The resolution of these factual disputes will determine whether the officers' use of force was excessive. If a jury finds that George only pulled his gun in defense of Loyd Adams, pursuant to Section 1289.25, and the family was otherwise non-resistant and complying with the officers' commands at the time the officers aimed their guns at them, then the officers' use of force was excessive and unreasonable. This right has long been clearly established. *See Holland*, 268 F.3d 1179, 1192 (10th Cir. 2001) (pointing a

firearm directly at a person constitutes excessive force, and to do so in the absence of resistance was unreasonable and excessive).

Accordingly, summary judgment is DENIED as to these claims.

### E.     Fourth Cause of Action – False Arrest/Imprisonment under State Law

A claim for false arrest cannot lie if there was probable cause for the arrest. *Overall v. State ex rel. Dep't of Pub. Safety,* 910 P.2d 1087, 1091 (Okla. Ct. App. 1995); *see also Gouskos*, 122 F. App'x at 970 ("The common-law tort of false arrest has a single element in Oklahoma: that the defendant-officer arrested the plaintiff without probable cause"). As discussed above, there was probable cause to arrest Ben Adams. Summary judgment with respect to his false arrest claim is GRANTED.

In the same vein, because there are genuine disputed issues of material fact as to whether there was probable cause to arrest George Adams, summary judgment is DENIED with respect to this claim. *Id.* The Court will address whether this claim proceeds against the officers in their individual capacity or the municipalities later in this Order.

### F.     Fifth Cause of Action - Assault & Battery under State Law

The Court next turns to Plaintiffs' assault and battery claims. The elements of assault are: (1) that the defendant acted intending to cause a harmful or offensive contact with the person, or an imminent apprehension of such a contact, and (2) the other person is put in such imminent apprehension. OUJI No. 19.1. The elements of battery are: (1) defendant intended to cause a harmful or offensive contact or an imminent apprehension of such contact; and (2) a harmful contact occurred. *See* OUJI No. 19.10. Plaintiffs claim

31

that the following events constituted an assault and battery: 1) the use of the dog on Ben; 2) the use of the dog on Barbara June; and 3) Defendant Paul pushing Barbara June.

As discussed above, there are material factual disputes regarding the circumstances and use of the police dog on Ben Adams. Accordingly, summary judgment is DENIED as to those claims. Similarly, factual disputes preclude summary judgment as to Defendant Paul's subsequent push of Barbara June.[21] However, this claim can only proceed as against Defendant Paul, as there is no evidence of intent or participation by Harryman and Brummett. The Court will address whether these claims proceeds against the officers in their individual capacity or the municipalities later in this Order.

However, the dog biting Barbara June is a different matter. Plaintiffs concede that Paul dispatched the dog to attack Ben, not Barbara June. *See* Doc. No. 116 at ¶ 30-31 (Plaintiffs' Response to Defendants Statement of Facts). It is likewise undisputed that Barbara June only received dog bites (if any) after she voluntarily inserted herself into the situation. *Id.* On these facts, the requisite element of intent is lacking.

Accordingly, the Court GRANTS summary judgment as to this claim.

### G. Seventh Cause of Action Malicious Prosecution – Barbara June, Ben, and George under Federal and State Law.

The Court next addresses Ben Adams, Barbara June Adams, and George Adams's malicious prosecution claims, asserted by Ben Adams, Barbara June Adams, and George Adams. Although not clear from the Amended Complaint, Plaintiffs' summary judgment

---

[21] Although the Court found that Paul did not intend to use this force to seize Barbara June, this does not bear on whether Defendant Paul intended to cause harmful or offensive contact when he pushed Barbara June out of the way.

responses indicate that Plaintiffs pursue these claims under both the common-law and § 1983.

The common-law is the starting point for Plaintiffs' state and federal malicious prosecution claims. Under the common law, Plaintiffs must show: the (1) the bringing of the original action by the defendant; (2) its successful termination in favor of the plaintiff; (3) want of probable cause to bring the action; (4) malice; and (5) damages. *Parker v. City of Midwest City*, 850 P.2d 1065 (1993). Under federal law, Plaintiffs must show: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008); *see also M.G. v Young* , 826 F.3d 1259, 1262 (10th Cir. 2016) (citing *id.*).

With these elements in mind, the Court turns to each Plaintiffs' claims.

     *1.    Ben Adams*

Defendants argue that Ben Adams's malicious prosecution claim fails for several reasons, including that Plaintiffs have not shown any evidence of malice. Doc. Nos. 94 at 34-35; 95 at 34. In response, Plaintiffs argue that the element of malice is met because Defendants distorted and falsified the factual statements in Ben Adams's probable cause affidavit. Such omissions could be evidence of malice. *See Peterson v. Underwood,* 220 P.3d 1158, 1164 (Okla. Civ. App. 2008) (indicating failure to disclose material fact could be evidence of malice); *Pierce v. Gilchrist*, 359 F.3d 1279, 1297 n. 12 (10th Cir. 2004)

(noting the application of "a standard of 'knowingly and intentionally, or with reckless disregard for the truth,' falsifying or omitting evidence, in the context of Fourth Amendment challenges" for evaluating the malice element) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). Upon review of the affidavit, however, the Court can discern no purportedly false or omitted material facts.

The affidavit states that Ben Adams towed a tractor that was stolen at the request of Garvin County Sheriff's Office, that he made repairs and improvements to it without the authorization of its owner, AIG, sold it in a private sale to Chris Rushing, and when that sale fell through and the police requested its return, he refused to do so unless he was paid over eleven thousand dollars for towing, storing and the unauthorized repairs. As discussed at length above, these facts are not disputed by Plaintiffs. At most, the affidavit could be construed to omit that Ben Adams entered into a conditional sale rather than a complete sale, but that does not change the fact that Ben Adams remitted possession of the tractor to Chris Rushing in exchange for money. It could also be read to omit that Ben Adams would have also turned over the tractor if police had a warrant. However, neither of these omissions, if included, would have vitiated probable cause.

Accordingly, because Plaintiffs fail to provide any evidence of malice with respect to Ben Adams's probable cause affidavit, summary judgment is GRANTED as to both his common-law and § 1983 malicious-prosecution-based claims.

### 2. *Barbara June Adams*

Similarly, Defendants argue, *inter alia*, that there is no evidence of malice as required for Barbara June's malicious prosecution claim. Doc. Nos. 94 at 34-35; 95 at 34.

Although there is no dispute that Detective Tompkins, a non-party, completed the probable cause affidavit, Plaintiffs argue that Defendants acted maliciously because they "deliberately falsified facts to support probable cause for the warrant." Doc. Nos. 115, at 31; 117, at 28. As evidentiary support of their claims against Defendant Paul, Plaintiffs cite to the statement of facts that Paul, through counsel, provided at summary judgment. Doc. Nos. 115, at 31. In support of their claims against Defendants Brummett and Harryman, Plaintiffs cite to the deposition testimony of George Adams, Ben Adams, and Loyd Adams. Doc. No. 117, at 28. This testimony describes Plaintiffs' account of the incident. From the cited testimony, it appears that Plaintiffs mean to argue that Barbara June's probable cause affidavit did not state that Ben Adams was handcuffed and on the ground when the police dog was sent to attack him.

Plaintiffs' theory is problematic because it requires the Court to make several assumptions. First, the Court would have to assume that the positions that Defendants have taken, through counsel, when defending themselves in this civil litigation, are the same statements Defendants would have made at the time Plaintiffs' probable cause affidavits were filled out. Next, this Court would have to assume that each Defendant provided this information directly to Detective Tompkins (the officer who filled out the probable cause affidavit) rather through another officer. Finally, the Court would have to assume that when providing this information, each Defendant omitted this information from Detective Tompkins. The Court is not permitted to make such assumptions at the summary judgment stage.

Accordingly, because Plaintiffs offer no other evidence of malice with respect to Barbara June's probable cause affidavit, summary judgment is GRANTED as to both her common-law and § 1983 malicious-prosecution-based claims.

### 3.    *George Adams*

Defendants also argue that Plaintiffs have not met their evidentiary burden with respect to George Adams's malicious prosecution because Plaintiffs cannot show want of probable cause or malice. As with Barbara June's malicious prosecution claim, George Adams's malicious prosecution claim against Defendants Harryman and Paul fails for lack of malice. The same, however, cannot be said as to Defendant Brummett.

As discussed above, there is a genuine dispute of material fact regarding whether there was probable cause to arrest George Adams. Accordingly, Plaintiffs have shown enough evidence at this stage for this element.

Further, Plaintiffs have shown sufficient evidence that Defendant Brummett acted with malice. Defendant Brummett completed George Adams's probable cause affidavit. Doc. No. 95-19. The affidavit states that probable cause existed to arrest George Adams for carrying a concealed weapon and pointing a firearm. *Id.* Taking the facts in the light most favorable to Plaintiffs, the probable cause affidavit for George Adams omits material information that would have undermined or vitiated probable cause. Specifically, the affidavit omits that George only pulled his gun after Harryman aimed a gun at Loyd's face in response to a request for "paperwork." As discussed above, if the events unfolded as Plaintiffs say they did, this would vitiate probable cause. Because Defendant Brummett filled out the probable cause affidavit, it is reasonable to infer that he

intentionally or recklessly omitted this information. Such intentional or even reckless omission of information that would vitiate probable cause, if proven, is evidence of malice. *See Peterson,* 220 P.3d at 1164; *Pierce,* 359 F.3d at 1297 n. 12. Accordingly, Plaintiffs have met the elements of George Adams's malicious prosecution claim under the common law and § 1983 as against Defendant Brummett.

Finally, Defendant Brummett would not be entitled to qualified immunity as to the § 1983 claim. The Court has already addressed qualified immunity in its probable cause analysis, *supra*. As to malice, there would be no qualified immunity for the omissions Plaintiffs assert, because the prohibition of the "omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986, in the context of information supplied to support a warrant for arrest." *Pierce,* 359 F.3d at 1298; *see also Bruning v. Pixler,* 949 F.2d 352, 357 (10th Cir. 1991) ("to knowingly or recklessly omit from an arrest affidavit information which, if included, would have vitiated probable cause," would violate a plaintiff's Fourth Amendment rights) (quoting *Stewart v. Donges,* 915 F.2d 572, 582–83 (10th Cir.1990)). Thus, Defendant Brummett should have known in 2013 that omitting material information (that George only pulled his gun after Harryman threatened to kill Loyd, without any justification or provocation) in a probable cause affidavit would violate the Fourth Amendment.

Accordingly, the Court GRANTS Defendants Paul and Harryman's motions for summary judgment as to George Adams's state and federal malicious prosecution claims and DENIES Defendant Brummett's motion summary judgment as to the same. The

Court will address whether this the state-law claim proceeds against the officers in their individual capacity or the municipalities later in this Order.

**V.     Official and Municipal Liability For § 1983 Claims**

At this juncture, the following § 1983 claims remain: 1) Plaintiffs' Fourth Amendment unlawful seizure claims for a) George Adams's arrest and b) lining the entire family up at gunpoint; 2) Plaintiffs' Fourth Amendment excessive force claims with respect to a) the use of the police dog on Ben Adams, b) Harryman aiming his gun at Loyd Adams, c) officers pointing their guns at George Adams after he dropped his weapon; d) aiming guns at Plaintiffs; and 3) Malicious Prosecution as to George Adams. The Court has already denied summary judgment to the Individual Defendants in their individual capacities on these claims; what remains is whether the counties and the Individual Defendants in their official capacities could also be liable.

The inquiry for whether a governmental employee is liable in his official capacity is the same as municipal liability. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (suing defendants in official capacity is "essentially another way of pleading an action against the county or municipality they represent"). Accordingly, the Court will apply the same inquiry for both the official capacity and municipal liability claims. *Id.* (applying "the standard of liability to municipalities and counties in assessing whether [plaintiff's] official capacity claim . . . survives summary judgment.")

A municipal employer will not be liable for injuries simply because the injuries were caused by the acts of a municipal employee:

> A local government . . . cannot be held liable under § 1983
> "*solely* because it employs a tortfeasor—or, in other words, a
> municipality cannot be held liable under § 1983 on a
> *respondeat superior* theory." *Id.* at 691, 98 S.Ct. 2018
> (emphasis in original). Instead, a local government is liable
> only when "the unconstitutional actions of an employee were
> *representative of an official policy or custom* of the municipal
> institution, or were carried out by an official with final policy
> making authority with respect to the challenged action."
> *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000)
> (emphasis added).

*Bird v. W. Valley City*, No. 15-4024, 2016 WL 4183957, at *13 (10th Cir. Aug. 8, 2016);

*see also Bryson v. City of Okla. City*, 627 F.3d 784 (10th Cir. 2010). Accordingly, a

municipal employer will not be liable for injuries simply because the injuries were caused

by the acts of a municipal employee. Rather, Plaintiffs must show "1) the existence of a

municipal policy or custom, and 2) that there is a direct causal link between the policy or

custom and the injury alleged." *Bryson*, 627 F.3d at 788 (quotations omitted).

Such policy or custom may take one of many forms: (1) a formal regulation or

policy statement; (2) an informal custom that amounts to "a widespread practice that,

although not authorized by written law or express municipal policy, is so permanent and

well settled as to constitute a custom or usage with the force of law;" (3) the decisions of

the final policymakers; (4) "ratification by such final policymakers of the decisions—and

the basis for them—of subordinates to whom authority was delegated subject to these

policymakers' review and approval;" or (5) the failure to adequately supervise or train

employees, provided that the failure results from a deliberate indifference to the injuries

that may be caused. *Bryson*, 627 F.3d at 788 (citations and quotation marks omitted).

### A. McClain County Entities

Plaintiffs proceed under the second, fourth, and fifth theories as to McClain County. They argue the McClain County Entities are liable because the final decision makers ratified the actions of their respective employees, that the employees of each county acted in compliance with an informal policy, and there was a failure to train.

#### 1. Ratification

To prevail on their ratification theory, Plaintiffs must show that "ratification by such final policymakers of the decisions-and the basis for them-of subordinates to whom authority was delegated subject to these policymakers' review and approval." *Bryson,* 627 F.3d at 788 (citations and quotation marks omitted). "[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions." *Id.* at 790.

Plaintiffs argue that Sheriff Hewett, the final decisionmaker, ratified Defendant Harryman and Brummett's conduct.[22] In support, Plaintiffs point to Hewett's testimony that he was unaware of the allegedly unconstitutional acts committed by the officers, believed his officers' accounts of the incident, and did not discipline them. Doc. No. 116, at 20-21.

Plaintiffs have not provided evidence that Hewett ratified Defendants' allegedly unconstitutional acts. As Defendants point out, that Sheriff Hewett was unaware of the allegedly unconstitutional conduct undermines any suggestion that he ratified such acts.

---

[22] Sheriff Hewett is not a party in this action.

*See Bryson*, 627 F.3d at 790 ("Where the City was not even aware of [defendant's] unconstitutional actions with respect to Plaintiff, it cannot be found liable under a ratification theory"). Nor does Hewett's belief of his officer's accounts of *constitutional* conduct show that Sheriff Hewett ratified the *unconstitutional* acts that Plaintiffs allege these officers committed. Finally, even if Sheriff Hewett had believed a constitutional violation had occurred, his failure to discipline these officers on this single incident is insufficient to create municipal liability. *See Butler v. City of Norman,* 992 F.2d 1053, 1056 (10th Cir.1993) ("we cannot hold that the failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under *Monell*") (citations and quotation marks omitted); *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("As for any failure to discipline Officer Aragon, basic principals of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation."); *see also Dempsey v. City of Baldwin*, 143 F. App'x 976, 986 (10th Cir. 2005) ("the ratification must be the moving force, or cause, of the alleged constitutional violation.")

Accordingly, the Court declines to find municipal liability on this basis.

### 2.    *Informal Policy*

Next, Plaintiffs urge that the Defendants' actions were pursuant to a municipal policy or custom. To prevail under this theory, Plaintiffs must show the existence of a municipal policy evidenced by a "practice[ ] so persistent and widespread as to practically have the force of law." *Connick v. Thompson,* 563 U.S. 51, 61 (2011). In this regard, Plaintiffs argue that "there was a standard custom/policy operative at McClain

County where officers routinely practiced the 'contempt of cop' and/or 'failed attitude test' custom or informal policy."

As evidence of this policy, Plaintiffs cite the opinion of their police-practices expert. Their expert opines that the officers' alleged conduct "perfectly fit[s] into the mold of contempt of cop." Doc. No. 116, at 23. However, as Defendants point out, even if this were true, a single instance is insufficient to show that there was a widespread practice of "contempt of cop" or the "attitude test." *See Williams v. City of Tulsa*, 627 F. App'x 700, 704 (10th Cir. 2015) (even a previous instance that was similar to the one at issue was not enough to serve as evidence of a widespread practice); *see also Wilson v. Cook Cty.,* 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice.") Accordingly, Plaintiffs cannot hold the municipalities liable under this theory.

### 3. *Failure to Train*

Finally, Plaintiffs argue that McClain County failed to train Defendants Harryman and Brummett, which led to their injuries. Municipal liability based on a failure to train is difficult to prove. The Supreme Court has observed that liability in this regard only attaches in "limited circumstances," and "[a] municipality's culpability for deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61 (citations omitted).

In the Tenth Circuit, plaintiffs alleging a failure to train must first show that the training was inadequate and then show:

(1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situations with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the party of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003) (citations omitted).

Plaintiffs' theory suffers from the outset because they have not provided evidence indicating that the officers received inadequate training on restraint holds. Plaintiffs argue that Defendants' discovery responses indicated that they received no training on restraint holds. Doc. No. 116, at 24. However, as Defendants point out the attached discovery responses do not refer, specifically or generally, to training that the officers received on restraint holds. *See* Doc. No. 116-9; 116-10. Indeed, the language that Plaintiffs quote in their brief does not appear in either set of discovery responses. *Id.* The record before the Court does not show that Defendants received inadequate training with respect to restraint holds.

Even if Plaintiffs could show inadequate training, their theory nevertheless fails because they cannot show that any failure to train arose out of deliberate indifference by the municipality. *See City of Canton, Ohio, v. Harris*, 489 U.S. 378, 388 (2011) (the failure to train officers must amount "to deliberate indifference to the rights of persons with whom the police come into contact"). To show deliberate indifference, a plaintiff must meet "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. Of Cnty. Comm'rs of*

*Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). Thus, if there is evidence that the municipality was on actual or constructive notice that a deficiency in their training program causes its employees to violate the constitutional rights of its citizens, a municipality may be deemed to be deliberately indifferent for retaining such a policy. *Connick*, 563 U.S. at 61-62. This can be done through a pattern of similar unconstitutional conduct or by "single-incident" theory of liability. Under the latter theory, the injury that the plaintiff suffered was an obvious or highly predictable consequence of the identified training deficiency. *Canton*, 489 U.S. at 390, n. 10. That is, Plaintiffs must show that the failure to train was the product of deliberate or conscious choice by the municipality. *Id.* at 388

Plaintiffs appear to proceed under the "single-incident of liability" theory. Plaintiffs argue the injuries they suffer at Defendants' hands were the obvious result of the failure to train these officers on proper restraint holds. Because, Plaintiffs argue, there is no uniform benchmark to performing proper holds and arrests, it was "highly predictable that these officers, if placed in highly emotionally charged scenarios . . . would respond erratically and do the arrests and holds in an illegal and forceful manner." However, aside from conclusory assertions, Plaintiffs present no evidence regarding the risk that inadequate training on restraint holds and arrests poses, nor any evidence that the municipality was aware of that risk. In other words, Plaintiffs provide no evidence that would suggest to the Court (or a jury) that the municipality's failure to train its officers on restraint holds and arrests was the product of a deliberate or conscious decision.

Finally, Plaintiffs do not provide evidence or even an argument to link any failure to train to the constitutional injuries that they contend they suffer. Plaintiffs accuse the officers of egregious acts – including aiming a gun at a citizen who requests a warrant, lining a compliant family up at gunpoint, arresting a father who was acting in self-defense of his son, deploying a police dog on a suspect who was handcuffed and on the ground, and omitting critical information from a probable cause affidavit. They have not, however, shown the Court how training on restraint holds and arrests would have prevented any of these acts. In other words, Plaintiffs have not shown how the failure to train officers on restraint holds and arrests would have caused the complained of constitutional violations. *See Brown v. Gray*, 227 F.3d 1278, 1290 (10th Cir. 2000) (to show failure to train, "'the identified deficiency in a city's training program must be closely related to the ultimate injury' . . . so that it 'actually caused' the constitutional violation") (quoting *Canton,* 489 U.S. at 391). Accordingly, municipal liability does not attach due to a failure to train.

For the reasons set forth above, the Court finds no basis to impose municipal liability on the McClain County Entities on Plaintiffs' § 1983 claims. Their motion for summary judgment as to these claims is therefore GRANTED.

### B.    Garvin County Entities

Plaintiffs argue that Garvin County is liable because it too ratified Defendant Paul's actions, and Defendant Paul's actions were the direct result of an informal policy or custom.

### 1. Ratification Theory

Plaintiffs argue that Sheriff Rhodes[23] ratified Defendant Paul's conduct because he testified that he agreed with how the officers acted and did not discipline Paul. This is virtually similar to Plaintiffs' ratification theory as to Sheriff Hewett and fails for the same reasons.

### 2. Informal Custom or Policy

Finally, Plaintiffs, citing to Defendant Paul's testimony, argue that Garvin County had the informal custom or policy of seizing property without a warrant. However, for municipal liability to attach, the custom or policy must have been the "moving force" behind the constitutional violation. *Canton*, 489 U.S. at 389 ("a municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation'") (citations omitted). Here, whether Garvin County had a policy of taking property without a warrant was not the moving force behind the federal claims that remain against Defendant Paul – the Fourth Amendment excessive force claims relating to Ben's treatment when he was already in handcuffs and aiming guns at the family despite their compliance. Garvin County's seizure of property policies have no bearing on these actions. At most, this informal policy is connected to the officers' initial presence at the premises to take the tractor. The seizure of the tractor, however, is not at issue in this action, and the Court has already found that the officers had probable cause to arrest Ben Adams for his conduct involving the tractor. Accordingly, this does not change the analysis.

---

[23] Sheriff Rhodes is not a party to this action.

Accordingly the Court GRANTS the Garvin County Entities' Motion for Summary Judgment as to the § 1983 Actions.

## VI.    Municipal Liability for State Law Claims

Finally the Court turns to municipal liability on Plaintiffs' state law claims. As discussed above, the Court has found that the following state-law claims survive summary judgment: 1) the George Adams's false arrest claim; 2) Ben and Barbara June Adams's assault and battery claims; and 3) George Adams's malicious prosecution claim.

The question remains whether the Individual Defendants in their individual capacities or their respective municipalities will face liability.[24] To answer that question, the Court must resolve whether the Individual Defendants were acting within the scope of their employment. If they were not, then they alone face liability and their employers do not. *Martin v. Johnson*, 975 P.2d 889, 895-96 (1998). If they were acting within the scope of their employment, then their employers will face liability. *Id.* The OGTCA has defined "scope of employment" as:

> performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority including the operation or use of an agency vehicle or equipment with actual or implied consent of the supervisor of the employee, but shall not include corruption or fraud

---

[24] The Individual Defendants argue, in a conclusory fashion, that they are entitled to immunity because in their Amended Complaint, Plaintiffs allege they were acting in the scope of their employment. Plaintiffs make clear that they have asserted alternative theories of liability with respect to the scope of employment. The Court therefore finds this argument unpersuasive. Defendants also argue that they are entitled to governmental immunity with respect to this claim because malicious prosecution "is not the type of tort that is committed outside the scope of employment as law enforcement officers." Doc. No. 96, at 13. They cite no authority for this proposition and the Court does not find this argument persuasive.

Okla. Stat. Ann. tit. 51, § 152(12). Accordingly, employees who act in bad faith or in a willful, wanton manner will not be immune from tort liability. *See Nail v. City of Henryetta*, 911 P.2d 914 (1996) (immunity under the GTCA "does not extend to employees who act in a willful or wanton manner while performing functions within the scope of employment.") (citing *Holman v. Wheeler,* 677 P.2d 645, 647 (Okla. 1983)). In general "[t]he question of whether an employee has acted within the scope of employment at any given time is normally a question for the jury." *Id.* at 918. This is, however, "except in cases where only one reasonable conclusion can be drawn from the facts." *Id*. at 918. For the most part, this is one of those cases.

A. **Common-law Malicious Prosecution**

As an initial matter, the Court GRANTS the municipalities' motions for summary judgment as to the malicious prosecution claims. Oklahoma law is clear that because this tort includes the element of bad faith, an officer who committed this tort necessarily acted in bad faith and a municipality cannot be liable for this tort under a theory of municipal liability. *Parker,* 850 P.2d at 1068.

B. **False Arrest Claim**

For Plaintiffs to succeed on George Adams's false arrest claim, they will have to prove that George pulled his gun in self-defense. To do that, they must prove that Defendant Harryman pointed a gun at Loyd Adams after Loyd asked him for his "paperwork," and said that "This is my warrant, I can kill you." These acts could not have happened without the officers acting in bad faith and in turn, outside the scope of their employment. Accordingly, the McClain and Garvin County Entities' motions for

summary judgment as to these claims are GRANTED and Paul, Harryman and Brummett's are DENIED.

### C. Assault and Battery Claims

Likewise, for the assault and battery of Ben Adams regarding the dog bite, Plaintiffs must prove that Defendant Paul's use of the dog was improper. Plaintiffs' theory in that regard is that Paul released the dog after Ben was in handcuffs on the ground, and pushed Barbara June away from the dog when she tried to intervene. Defendants argue that Ben was resisting arrest and the deployment of the dog was necessary. Thus, for Plaintiffs to prevail, the jury must believe that Ben was already subdued at the time the dog was released. If this is true, such an act could not be done in good faith. Accordingly, Defendant Paul and Harryman's motions for summary judgment are DENIED as to Ben Adams's assault and battery claim. The McClain County and Garvin County Defendants motions are GRANTED.

However, the Court cannot reach the same conclusion about Barbara June Adams's assault and battery claim with respect to Defendant Paul's push. It is undisputed that he pushed her in response to her intervening with the police dog's attack on her son. On this record, material fact questions exist whether Paul's act of pushing Barbara June was within the scope of his employment. As was the case in *Nail*, it is not clear whether Paul was intending to cause harm or an offensive contact to Barbara June when he pushed her, or whether he was moving her out of the way of the dog. *See Nail*, 911 P.2d 914 (fact questions as to scope existed when it was not clear whether officer was attempting to hurt when he shoved him or attempted him to fall). However, it is clear that

to the extent liability will extend, it will only reach either Defendant Paul or the Garvin County Entities. Accordingly, summary judgment is GRANTED as to the McClain County Defendants Brummett and Harryman, and DENIED as to Defendant Paul and the Garvin County Entities.

## VII. Excessive Force Claim Under Oklahoma Constitutional

Plaintiffs concede that, because excessive force claims against officers may be pursued under the GTCA, their excessive force claim under the Oklahoma Constitutional claim cannot lie. Doc. No. 116, at 30.

## VIII. Punitive Damages

As all parties concede, Plaintiffs' claims for punitive damages may only proceed against the individual defendants in their individual capacities. Doc. Nos. 115, at 31; 116, at 30; 117, at 28-29; 118, at 27. Accordingly, to the extent Plaintiffs Amended Complaint purported to seek punitive damages against the individual defendants in their official capacities or against the municipalities, summary judgment is GRANTED. As to the Individual Defendants, for the reasons stated above, genuine disputes of material fact preclude summary judgment on Plaintiffs' claim for punitive damages against the Individual Defendants.

## IX. Conclusion

The McClain County Entities' Motion for Summary Judgment (Doc. No. 95) is GRANTED in its entirety.

Plaintiffs' Second Cause of Action for Unlawful Seizure of Property and Sixth Cause of Action for Conversion are DISMISSED by agreement.

The Garvin County Entities' Motion for Summary Judgment (Doc. No. 93); Defendant Paul's Motion for Summary Judgment (Doc. No. 94); and Defendants Harryman and Brummett's Motion Summary Judgment (Doc. No. 96) are GRANTED IN PART AND DENIED IN PART, as follows:

Summary judgment is GRANTED as to the following claims:

1) Ben Adams's Fourth Amendment Claim for Unconstitutional Deprivation of Liberty and Seizure of Person against Defendants Harryman and Brummett with respect to his arrest;

2) Barbara June Adams's Fourth Amendment Excessive Force Claims against all Defendants;

3) Ben and Barbara June Adams' § 1983 and common-law Malicious Prosecution Claims;

4) Ben Adams's False Arrest Claim;

5) Barbara June's Assault and Battery Claim against all Defendants as to the dog bite;

6) Barbara June's Assault and Battery Claim against Defendants Harryman and Brummett as to Paul's push; and

7) George Adams's § 1983 and common-law Malicious Prosecution Claims against Harryman and Paul; and

8) All Plaintiffs Claims pursuant to § 1983 against the Garvin County Entities.

Summary judgment is DENIED as to the following claims under 42 U.S.C. § 1983:

1) All Plaintiffs' Fourth Amendment Claims for Unconstitutional Deprivation of Liberty and Seizure of Person against Defendants Harryman and Brummett with respect to being lined up at gunpoint;

2) George Adams's Fourth Amendment claim for Unconstitutional Deprivation of Liberty and Seizure of Person against Defendants Harryman and Brummett with respect to his arrest;

3) Ben Adams's Fourth Amendment Excessive Force Claims against Defendants Harryman, Paul, and Brummett, with respect to being kneed in the back by

51

Defendant Harryman and having a police dog attack him while he was handcuffed and compliant;

4)      All Plaintiffs' Fourth Amendment Excessive Force Claims against Defendants Harryman, Paul, and Brummett with respect to instances when the officers aimed their guns at the family; and

5)      George Adams's Malicious Prosecution Claims against Defendant Brummett

Summary judgment is DENIED as to the following state-law claims:

1)      George Adams's claim of False Arrest against Defendant Harryman, Brummett, and Paul;

2)      Ben Adams's claim of Assault and Battery against Defendant Paul and Harryman;

3)      Barbara June Adams's claim of Assault and Battery against Defendant Paul and Garvin County Sheriff's Office and the Garvin County Board of Commissioners;[25] and

4)      George Adams's claim of Malicious Prosecution against Defendant Brummett.


IT IS SO ORDERED this 21st day of September, 2016.


DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE

---

[25] The Garvin County Entities only argued about whether they were proper parties with respect to the 42 U.S.C. § 1983 claims, not the state law claims. Because only state-law claims remain against the Garvin County Entities, the Court need not address these arguments.